IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

```
                              *
JOSEPH WEIGEL, et al.,
                              *
     Plaintiffs,
                              *
        v.
                              *    CIVIL NO.: WDQ-12-2723
STATE OF MARYLAND, et al.,
                              *
     Defendants.
                              *
```

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

Joseph Weigel sued the State of Maryland and Armistead Homes Corporation ("Armistead") for declaratory and injunctive relief. ECF No. 1. On September 12, 2012, Weigel moved for a temporary restraining order ("TRO") and preliminary injunction. ECF Nos. 2, 3. On October 15, 2012, Weigel and others[1] (collectively, the "Plaintiffs") filed an amended, class action complaint. ECF No. 20. On October 25, 2012, the Plaintiffs filed a second motion for a TRO and preliminary injunction. ECF No. 22. On November 7 and 8, 2012, the Defendants moved to dismiss. ECF Nos. 25, 28. No hearing is necessary. *See* Local

---

[1] The amended complaint added as plaintiffs Joanna Profili and Jenine Gangi, and added as defendants Maryland Governor Martin J. O'Malley, Maryland Attorney General Douglas F. Gansler, the Court of Appeals of Maryland, and Chief Judge of the Court of Appeals Robert M. Bell (collectively, the "Defendants"). ECF No. 20. This memorandum opinion will refer to the State of Maryland, the Maryland Court of Appeals, and the State officials as "the State Defendants."

Rule 105.6 (D. Md. 2011). For the following reasons, the State Defendants' motion to dismiss will be granted; all other pending motions will be denied as moot.

I. Background[2]

A. Armistead

Armistead is a nonprofit, nonstock cooperative housing corporation that owns, in fee simple, about 1500 residential properties in Baltimore, Maryland. ECF No. 16-1 ¶ 3; ECF No. 20 ¶ 34. Membership in Armistead is open to persons who enter into a leasehold agreement[3] for one of the properties. ECF No. 20 ¶

---

[2] On a motion to dismiss, the well-pled allegations in the complaint are accepted as true. *Brockington v. Boykins*, 637 F.3d 503, 505 (4th Cir. 2011). The Court will consider the pleadings, matters of public record, and documents that are integral to the complaint and whose authenticity is not disputed. *See Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009); *Witthohn v. Fed. Ins. Co.*, 164 F. App'x 395, 396 (4th Cir. 2006) (per curiam) ("[A] court may consider official public records, documents central to the plaintiff's claim, and documents sufficiently referred to in the complaint so long as the authenticity of these documents is not disputed."); *Richmond, Fredericksburg & Potomac R.R. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991) (in determining whether it has jurisdiction, the Court "may consider evidence outside the pleadings without converting the proceeding to one for summary judgment").

[3] Armistead attached copies of Weigel's signed leasehold documents to its responsive brief to the first TRO motion. ECF Nos. 16-2, 16-3. Armistead implies that the documents are identical to those signed by all new Armistead members, including Profili, Gangi, and the proposed class. *See* ECF No. 16 at 6 (characterizing the exhibits as "Armistead's operative documents"). The Plaintiffs have not objected to this characterization and attached the same documents to their second motion for a TRO and preliminary injunction. ECF Nos. 22-8, 22-9.

34. Each lease is for a 99-year term, with two options to renew. *See* ECF No. 16-2 at 2 (Part I). Upon entering the agreement, members pay a membership fee and a downpayment on the "[d]welling [p]rice" of their homes. *See id.* (Part II). Members also submit monthly payments to Armistead, which include part of the outstanding balance of the dwelling price plus interest, repayment of home-related loans, and operating charges set by Armistead's board of directors. *See id.* (Part III). "There is no doubt that a membership in [Armistead], together with the related leasehold interest in a dwelling unit, constitutes a property interest." 85 Md. Op. Att'y Gen. 265, 267 (2000).

> In exchange for membership, members are
>
> subject to the provisions of [Armistead's] Articles of Incorporation, By-Laws, Rules, Regulations, Dwelling Leaseholds[,] and Conditions of Dwelling Leaseholds of the Corporation, including . . . the following restrictions, limitations, and conditions:
> . . .
> *(c)* that [the Membership Certificate], and all rights and privileges of Membership, are subject to termination and cancellation by [Armistead] in case: (1) an event of default occurs under the Dwelling Leasehold or the aforesaid provisions applicable to Memberships; and (2) the Member, after [30] days notice of the default, fails to cure the default in a manner satisfactory to [Armistead] . . . .

ECF No. 16-6 at 2.

Under the Dwelling Leasehold, a member "defaults" when he "default[s] in the performance of any of the covenants, or

3

agreements or conditions on the part of the Member to be

preformed [sic] under this Dwelling Leasehold." ECF No. 16-2 at

3 (Part IV(5)). The Dwelling Leasehold incorporates, by

reference, the Conditions of Dwelling Leaseholds (the

"Conditions"). ECF No. 16-2 at 2 (Part I).[4] Accordingly,

failure to comply with the Conditions is a default. The

Conditions provide:

> [Armistead] reserves the right to impose any
> reasonable rules and regulations and to change the
> same from time to time, as in its judgment may be
> necessary or desirable for the continued protection of
> the Housing Development as a good living environment,
> for the safety, care[,] and cleanliness of Dwellings
> and surrounding premises, and for the preservation of
> good order and comfort there. Each Member shall
> faithfully observe and comply with such rules and
> regulations and all persons living in the Dwelling
> shall also observe and comply with such rules and
> regulations.

ECF No. 16-3 at 2 (¶ 5(c)).

Upon a member's default, Armistead must provide him with

notice of the default[5] and an opportunity to "cure."[6] ECF No.

---

[4] The Conditions are recorded in Baltimore City's land records
and attach to Armistead's properties. *See* ECF No. 16-2 at 2
(Part I).

[5] The notice of default must indicate that the member's lease-
hold "will expire at a date not less than [20] days before the
next due date for making monthly payments and this Dwelling
Leasehold and all of the [m]ember's rights hereunder will expire
on the date so fixed in such notice." ECF No. 16-2 at 3 (Part
V).

[6] The Dwelling Leasehold provides a 20-day cure period, but the
Certificate of Membership indicates that the cure period is 30

4

16-2 at 3 (Part V). Failure to cure authorizes Armistead to file suit for breach of lease and eviction. *See generally* Md. Code Ann., Real Prop. § 8-402.1; 85 Md. Op. Att'y Gen. at 267-70.[7]

B. The Plaintiffs

The Plaintiffs and the proposed class are members and leaseholders of Armistead and, accordingly, "assumed and agreed to become bound by all the covenants of [D]welling [L]easeholds, pertaining to the respective premises." ECF No. 20 ¶¶ 36, 49; ECF No. 22-1 at 3. Each owns one or more licensed dogs "believed to be" pit bulls or pit bull mixes. ECF No. 20 ¶¶ 20-

---

days. ECF No. 16 at 6 n.4 (comparing ECF No. 16-2 at 3 (Part V) with ECF No. 16-6 at 2). Armistead asserts that this "anomalous[]" difference does not "change the process that Armistead can and does follow to prosecute a default by a tenant/member, nor does it obviate the need for an eviction action under Maryland law." *Id.*

[7] Violation of the Conditions may also cause expulsion under Armistead's By-Laws, *see* ECF No. 16-5 at 16 (art. 5, § 8), which provide:

> In addition to other rights of [Armistead] to terminate, sell[,] or acquire memberships by reason of a default by a member in his obligations, [Armistead] may expel a member and terminate his rights of membership if, after due inquiry and hearing, the board of directors by a majority vote finds and determines that such member is undesirable to continue as a member and holder of an Apartment Leasehold in [Armistead's] housing development . . . because of objectionable conduct on the part of the member . . . .

*Id.* Within 10 days after receiving notice of an expulsion decision, the member can appeal it. *Id.*

22, 39-40. Under Maryland law, licensed dogs are "personal property." Md. Code Ann., Art. 24 § 11-506.

C. *Tracey v. Solesky*

1. The April 26, 2012 Decision

*Tracey v. Solesky* ("*Tracey*") arose from a pit bull attack on a young boy named Dominic Solesky.[8] Having sustained "life threatening injuries" during the attack, Solesky underwent multiple surgeries and spent a year in rehabilitation. *Tracey*, 50 A.3d at 1078. On March 24, 2008, Solesky's parents sued the dog's owners and the landlord of the property from which the dog had escaped, in the Circuit Court for Baltimore County. *Solesky v. Tracey*, 17 A.3d 718, 720 (Md. Ct. Spec. App. 2011). The plaintiffs asserted negligence and strict liability claims against all defendants, and additional assault and battery claims against the dog's owners. *Id.* at 723 & n.3. The claims against the owners were discharged in bankruptcy. *Id.* at 720.

At the close of the plaintiffs' case, the court granted the defendant landlord's motion for judgment. *Tracey*, 50 A.3d at 1078. The court held that that there was insufficient evidence

---

[8] *Tracey v. Solesky*, 50 A.3d 1075, 1078 (Md. 2012). The *Tracey* court noted that, over the past 13 years, "there have been no less than seven instances of serious maulings by pit bulls upon Maryland residents resulting in either serious injuries or death that have reached the appellate courts of this State." *Id.* at 1076.

of negligence[9] to present the case to the jury. *Id*. The
Maryland Court of Special Appeals reversed, holding that the
evidence created a jury issue about the extent of the landlord's
prior knowledge of the dog's dangerousness. *Id*.

On April 26, 2012, the Court of Appeals of Maryland
affirmed and directed the Court of Special Appeals to remand for
a retrial. *Tracey*, 50 A.3d at 1089-90. The court recognized
that the trial judge had correctly applied the then-prevailing
standard of negligence to the landlord's conduct. *Id*. at 1078.
However, the court decided to "modify[]" that standard, "as it
relates to attacks by pit bull and cross-bred pit bull dogs
against humans." *Id*. at 1079. Under the court's new rule,

> upon a plaintiff's sufficient proof that a dog
> involved in an attack is a pit bull or a pit bull mix,
> and that the owner, or other person(s) who has the
> right to control the pit bull's presence on the
> subject premises (including a landlord who has the
> right and/or opportunity to prohibit such dogs on
> leased premises as in this case) knows, or has reason
> to know, that the dog is a pit bull or cross-bred pit
> bull mix, that person is strictly liable for the
> damages caused to a plaintiff who is attacked by the
> dog on or from the owner's or lessor's premises.

---

[9] "Negligence" describes conduct that "falls below the legal
standard established to protect others against unreasonable risk
of harm." *Black's Law Dictionary* 1133 (9th ed. 2009); *see id*.
(stating that the term "denotes culpable carelessness"). At
common law, Maryland courts applied this standard to all dog
bite cases. *Bachman v. Clark*, 97 A. 440, 441 (Md. 1916) ("[T]he
owner of a dog is not liable for injuries caused by it, unless
it has a vicious propensity and notice of that fact is brought
home to him."). By contrast, "strict liability" is "based on
the breach of an absolute duty to make something safe." *Black's
Law Dictionary* 998 (9th ed. 2009).

*Id.* at 1089.

    This modification was warranted, the court reasoned, because of pit bulls' "aggressive and vicious nature" and "capability to inflict serious and sometimes fatal injuries," *Tracey*, 50 A.3d at 1080.  The court relied upon "strong dicta" in *Matthews v. Amberwood Associates Ltd. Partnership, Inc.*[10]; a 2000 report on dog attacks in the Journal of the American Veterinary Medical Association[11]; a 2011 article in the Annals of Surgery[12]; *Mortality and Morbidity* weekly reports by the Centers

---

[10] 719 A.2d 119, 127 (Md. 1998) ("The extreme dangerousness of [pit bulls], as it has evolved today, is well recognized."); *see id.* at 127-28 & n.4 (*citing Starkey v. Twp. of Chester*, 628 F. Supp. 196, 197 (E.D. Pa. 1986); *Giaculli v. Bright*, 584 So. 2d 187, 189 (Fla. App. 1991); *State v. Peters*, 534 So. 2d 760, 764 (Fla. App. 1988); *Hearn v. City of Overland Park*, 772 P.2d 758, 768, 765 (Kan. 1989); *State v. Livingston*, 420 N.W.2d 223, 230 (Minn. Ct. App. 1988); and *People v. Garraway*, 589 N.Y.S.2d 942, 943 (N.Y. App. Div. 1992); and referencing state and municipal legislation that "classify pit bull dogs as vicious, thus enabling them to control or ban this breed's presence in their communities").

[11] According to the report, pit bull-type dogs were involved in about one-third of human fatalities caused by dog bites between 1981 and 1992.  Jeffrey J. Sacks et al., *Breeds of Dogs Involved in Fatal Human Attacks in the United States Between 1979 and 1998*, 217 J. Am. Veterinary Med. Ass'n 836, 836 (2000).  The report concluded that "there appears to be a breed-specific problem with fatalities," *id.* at 839, but noted the difficulties "inherent in determining a dog's breed with certainty," *id.*

[12] The abstract "[c]onclu[ded]" that pit bull attacks are "associated with higher morbidity rates, higher hospital charges, and a higher risk of death than are attacks by other breeds of dogs."  John K. Bini et al., *Mortality, Mauling, and Maiming by Vicious Dogs*, 253 Annals Surgery 791 (2011) (Abstract).

for Disease Control[13]; and caselaw from other jurisdictions. *See id.* at 1083-89. The court also emphasized that at least 10 other states have "some form of state-strict liability statute in which the finding of dangerousness of the particular attacking dog is not necessary to establish [liability]." *Id.* at 1089.

Judge Greene[14] wrote a lengthy dissent. He contended, *inter alia*, that *Tracey*'s new rule was "grounded ultimately upon perceptions of a majority of this Court about a *particular breed* of dog, rather than upon adjudicated facts showing that the responsible party possessed the requisite knowledge of the animal's inclination to do harm." *Tracey*, 50 A.3d at 1090 (Greene, J., dissenting). Those perceptions transformed "a clear factual question into a legal one in an effort to create liability." *Id.* Judge Greene argued that the transformation was particularly problematic given the disputed accuracy of dog bite statistics and the lack of expert testimony on pit bulls' allegedly inherent dangerousness. *Id.* at 1090-91. In light of this conflicting evidence, he concluded that "[t]he issues raised involving breed-specific regulation are not appropriate for judicial resolution; rather, those issues are best resolved

---

[13] *See, e.g.*, *Dog-Bite Related Fatalities-United States, 1995-1996*, Centers for Disease Control & Prevention (May 30, 1997), http://www.cdc.gov/mmwr/preview/mmwrhtml/00047723.htm.

[14] Joined by Judges Harrell and Barbera.

by the Maryland General Assembly."[15]

2. The August 21, 2012 Reconsideration

On May 25, 2012, the defendant landlord moved for
reconsideration, arguing that "the imposition of a 'new duty' on
landlords was fundamentally unfair and unconstitutional as
applied."[16] On August 21, 2012, the court granted the motion in
part and denied it in part. *Tracey*, 50 A.3d at 1098. The court
denied the motion "[a]s to the Court's holding with respect to
pit bulls," explaining that "there is [no]thing unconstitutional
or unfair about holding Ms. Tracey liable for the gruesome
damage done to Dominic Solesky by a pit bull that she knowingly
. . . allowed her tenant to keep on her property." *Id.* at 1096-
97. The court emphasized that its April 26, 2012 decision was
"not as dramatic and pervasive as the [landlord's] motion
claim[ed]" because it neither "prohibit[ed] the ownership or
breeding of pit bulls" nor "require[d] that persons who own such

---

[15] *Tracey*, 50 A.3d at 1096 (Greene, J., dissenting); *see also id.*
("Taking into consideration the lack of evidence in the record
of this case with regard to the landlord's knowledge of the
vicious propensities of the dog, the conflicting studies about
how best to control the dog bite 'epidemic' mentioned herein,
and the problems inherent in defining what constitutes a 'mixed-
breed' pit bull, the matter of creating a new standard of
liability is fraught with problems and is beyond the sphere of
resolution by any appellate court.").

[16] *Tracey*, 50 A.3d at 1096.

10

dogs get rid of them." *Id.* at 1097.[17] Instead, the decision "simply requires that those who possess [pit bulls] or permit [pit bulls] to be on their property take reasonable steps to assure that they do not run loose or otherwise are in a position to injure other people." *Id.*

However, the court granted the motion in part to delete any reference to cross-bred pit bulls, "so that the Court's holding would apply only to pit bulls that are not cross-breds." *Tracey*, 50 A.3d at 1097. The court gave two reasons for this amendment. First, there was "never any assertion, suggestion, or finding in this case that the dog was a cross-bred." *Id.* Second, "it is not at all clear what 'cross-bred' really means." *Id.*

3. *Tracey's* Aftermath

Before the April 26, 2012 *Tracey* decision, Armistead's "Handbook for Member-Residents" permitted members' ownership of "no more than two animals." ECF No. 20 ¶ 41. The Handbook did not prohibit pit bulls. *Id.* At a June 7, 2012 meeting, Armistead's board of directors considered a motion that no pit bull or cross-bred pit bull be permitted on Armistead's

---

[17] *But cf. Tracey*, 50 A.3d at 1093 (Greene, J., dissenting) (arguing that, under the new rule, "the only corrective action an owner, keeper, or landlord could possibly take to avoid liability for the harm caused to another by a pit bull or mixed-breed pit bull is not to possess or allow possession of this specific breed of dog on the premises").

premises, and that any leaseholder who "caused" or "allows" any such dog to be brought onto the premises "shall have committed a material breach of the Dwelling Leasehold and the Conditions of Dwelling Leasehold." ECF No. 16-1 ¶ 4. The motion passed unanimously. *Id.* By August 10, 2012 letter, Armistead President Sharon Vick notified members of the new rule:

> Maryland's highest court recently ruled that pit bulls and cross-bred pit bull mixes are "inherently danger-ous." The court also ruled that, if a pit bull or cross-bred pit bull mix bites someone, the dog's owner will be liable for the bite, and the landowner who can control access to such dogs could be liable as well.
>
> The board of directors has decided that it is in the best interests of Armistead . . . and the residents to ban pit bulls and cross-bred pit bull mixes. **Therefore, no pit bulls or cross-bred pit bull mixes are permitted on Armistead Property**. If you have a pit bull or cross-bred pit bull mix, you must get rid of the animal immediately. If you have a visitor to your leasehold, you must not permit the visitor to bring a pit bull or cross-bred pit bull mix onto Armistead Property.
>
> The Board may take legal action, including termination, against leaseholders [who] fail to comply with the ban.

ECF No. 16-4 at 2 (emphasis in original).[18] Armistead did not define "pit bull." *See id.* As of September 26, 2012, Vick swore that Armistead had not given notice of default to--or sued to evict--any member based solely on his pit bull ownership.

---

[18] According to Armistead, its board recently "rescinded" this rule to the extent that it applied to cross-bred pit bulls, "so that the rule/ban now applies only to 'pit bulls' as the term has been used in the *Tracey* decisions." ECF No. 29 at 6 n.2.

ECF No. 16-1 ¶¶ 5-6.

The Plaintiffs assert that they and the proposed class "subsist on an extremely low income and cannot afford to pay the rents charged elsewhere" and "will be forced to sleep in parks, under bridges, or in their cars, or to set up tents or trailers in the woods" if evicted. ECF No. 20 ¶¶ 1, 37.[19] Further, the Executive Director[20] of the Baltimore Animal Rescue and Care Shelter, Inc. ("BARCS") swears that 500 dogs may be "implicated by" Armistead's decision to ban pit bulls,[21] and indicates:

> BARCS is not equipped to handle such a volume of animals and, while we would do our best to place the animals in a rescue, foster care, or up for adoption, . . . it is likely that the vast majority of them would have to be euthanized. Furthermore, it would also be impossible to process and contain the animals from Armistead . . . until a speedy disposition could be effectuated. Therefore we would have to consider closing our doors to incoming animals until space and time allow.

ECF No. 20-1 ¶ 8. The Plaintiffs stress that, if BARCS closes, the public "will not be able to bring in sickly animals that are infected with contagious diseases, posing a serious public health risk to both people and animals." ECF No. 22-1 at 2.

---

[19] The Plaintiffs swear that the prospect of losing their homes has caused them emotional distress "to the point where it is affecting [their] ability to function daily." ECF No. 22-2 ¶ 6; ECF No. 22-3 ¶ 6; ECF No. 24 ¶ 6.

[20] Jennifer Brause.

[21] ECF No. 20-1 ¶ 6.

They conclude that immediate action is necessary to prevent these "looming catastrophic consequences." *Id.* at 3.

D. Procedural History

On September 12, 2012, Weigel sued the State of Maryland and Armistead for declaratory and injunctive relief. ECF No. 1.[22] Also on September 12, Weigel moved for a TRO and preliminary injunction. ECF Nos. 2, 3. The parties could not reach a standstill agreement. *See* ECF Nos. 7, 9, 10, 11. On September 27, 2012, the State opposed Weigel's first motion for a TRO. ECF No. 14.[23] On September 28, 2012, Armistead opposed Weigel's first motion for a TRO. ECF No. 16.[24] On October 15, 2012, the Plaintiffs filed an amended, class action complaint for declaratory and injunctive relief. ECF No. 20.[25] On October 25,

---

[22] Weigel alleged three causes of action under the Fourteenth Amendment to the U.S. Constitution: procedural due process, substantive due process, and Fifth Amendment taking. ECF No. 1 ¶¶ 43-64.

[23] The State argued that it is immune from suit in federal court. ECF No. 14 at 3, 5-6.

[24] Armistead contended that, as a private corporation, it is "legally incapable of violating Mr. Weigel's asserted constitutional rights." ECF No. 16 at 8, 8-15.

[25] The Plaintiffs allege nine causes of action that are, in substance, identical to those alleged in the initial complaint:
(1) "Violation of Fourteenth Amendment Rights - Unconstitutional Vagueness," against all defendants except Armistead, ECF No. 20 ¶¶ 61-71;
(2) "42 U.S.C. § 1983 Violation of Fourteenth Amendment Rights - Unconstitutional Vagueness," against Governor O'Malley, Attorney General Gansler, and Judge Bell, *id.* ¶¶ 72-85;

14

2012, the Plaintiffs filed a second motion for a TRO and preliminary injunction. ECF No. 22. The Plaintiffs filed a supplement to the motion on October 28, 2012. ECF No. 24. On November 7, 2012, the State Defendants moved to dismiss. ECF No. 25. On November 8, 2012, the Defendants opposed the Plaintiffs' second motion for a TRO and preliminary injunction. ECF Nos. 27, 29. Also on November 8, Armistead moved to

---

(3) "Violation of Fourteenth Amendment Rights - Arbitrary and Irrational Enforcement," against all defendants except Armistead, *id.* ¶¶ 86-98;

(4) "42 U.S.C. § 1983 Violation of Fourteenth Amendment Rights - Arbitrary and Irrational Enforcement," against Governor O'Malley, Attorney General Gansler, and Judge Bell, *id.* ¶¶ 99-114;

(5) "Violation of Fifth Amendment Takings Clause - Seizure of Property," against all defendants, *id.* ¶¶ 115-26;

(6) "42 U.S.C. § 1983 Violation of Fifth Amendment Rights - Seizure of Property," against Governor O'Malley, Attorney General Gansler, Judge Bell, and Armistead, *id.* ¶¶ 127-41;

(7) "Violation of Article 24 of the Maryland Declaration of Rights - Unconstitutional Vagueness," against all defendants except Armistead, *id.* ¶¶ 142-53;

(8) "Violation of Article 24 of the Maryland Declaration of Rights - Arbitrary and Irrational Enforcement," against all defendants except Armistead, *id.* ¶¶ 154-67; and

(9) "Violation of Article III, § 40 of the Maryland Constitution - Seizure of Property," against all defendants, *id.* ¶¶ 168-84.

In addition to demanding a jury trial, the Plaintiffs request that the Court: (1) declare that *Tracey* is "unconstitutional, void, and unenforceable"; (2) declare that *Tracey* "cannot be used [by Armistead] as a basis for evicting tenants"; (3) declare that leasehold agreements with Armistead that are "implicated by" *Tracey* are "still valid" and "preliminarily and permanently restrain[] interference with such leasehold agreements"; (4) preliminarily and permanently restrain "enforcement" of *Tracey*; (5) preliminarily and permanently restrain Armistead from evicting tenants "based on" *Tracey*; and (6) grant "such other and further relief as this Honorable Court deems just and proper." ECF No. 20 at 1, 31.

15

dismiss. ECF No. 28. On December 17, 2012, the Plaintiffs opposed the motions to dismiss and replied in support of their motions for a TRO and preliminary injunction. ECF No. 34. On January 2, 2013, the Defendants replied in support of their respective motions to dismiss. ECF Nos. 35, 36.

II. Analysis

  A. Legal Standards

    1. Subject Matter Jurisdiction

Under Fed. R. Civ. P. 12(b)(1), the Court must dismiss an action if it discovers it lacks subject matter jurisdiction. The plaintiff has the burden of proving the Court has jurisdiction, and the Court must make all reasonable inferences in the plaintiff's favor. *Khoury v. Meserve*, 268 F. Supp. 2d 600, 606 (D. Md. 2003), *aff'd*, 85 F. App'x 960 (4th Cir. 2004). The Court may "look beyond the pleadings" to decide whether it has subject matter jurisdiction, but it must presume that the factual allegations in the complaint are true. *Id.*

    2. Failure to State a Claim

Under Fed. R. Civ. P. 12(b)(6), an action may be dismissed for failure to state a claim upon which relief can be granted. Rule 12(b)(6) tests the legal sufficiency of a complaint, but does not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).

The Court bears in mind that Rule 8(a)(2) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." *Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 325-26 (4th Cir. 2001). Although Rule 8's notice-pleading requirements are "not onerous," the plaintiff must allege facts that support each element of the claim advanced. *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 764-65 (4th Cir. 2003). These facts must be sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

This requires that the plaintiff do more than "plead[] facts that are 'merely consistent with a defendant's liability'"; the facts pled must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Twombly*, 550 U.S. at 557). The complaint must not only allege but also "show" that the plaintiff is entitled to relief. *Id.* at 679 (internal quotation marks omitted). "Whe[n] the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged--but it has not shown--that the pleader is entitled to relief." *Id.* (internal quotation marks and alteration omitted).

"The determination whether to dismiss with or without prejudice under Rule 12(b)(6) is within the discretion of the

district court."[26]  "[P]leading is [not] a game of skill in which one misstep by counsel may be decisive to the outcome . . . the purpose of pleading is to facilitate a proper decision on the merits." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002) (internal quotation marks omitted).  When a plaintiff fails to state a claim, he "should generally be given a chance to amend the complaint . . . before the action is dismissed with prejudice."[27]  But, dismissal with prejudice is proper if there is no set of facts the plaintiff could present to support his claim.  *See, e.g.*, *Cozzarelli v. Inspire Pharm., Inc.*, 549 F.3d 618, 630 (4th Cir. 2008).

B. The Motions to Dismiss

The State Defendants move to dismiss on the grounds that the Plaintiffs' Due Process claims (Counts I-IV, VII, VIII) are barred by the Eleventh Amendment; Chief Judge Bell and the judges of the Court of Appeals have absolute immunity from the Plaintiffs' claims for injunctive relief; the Plaintiffs have failed to allege any claim against the State officials; the Plaintiffs lack standing to bring their void-for-vagueness

---

[26] *180S, Inc. v. Gordini U.S.A., Inc.*, 602 F. Supp. 2d 635, 638-39 (D. Md. 2009) (*citing Carter v. Norfolk Cmty. Hosp. Ass'n*, 761 F.2d 970, 974 (4th Cir. 1985)).

[27] *FinServ Cas. Corp. v. Settlement Funding, LLC*, No. H-10-0264, 2010 WL 2757536, at *10 (S.D. Tex. July 13, 2010) (*citing Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002)).

claims (Counts I, II, VII); the Plaintiffs' Takings claims (Counts V, VI, IX) are not ripe for review; and the amended complaint, as a whole, fails to state a claim on which relief can be granted. ECF No. 25.[28] Armistead separately argues that, as a nongovernment actor, it is incapable of violating the Plaintiffs' constitutional rights. ECF No. 28. Armistead further argues that no taking has occurred. *Id.*

The Plaintiffs contend that the State Defendants are "proper parties" under *Stop the Beach Renourishment, Inc. v. Florida Department of Environmental Protection*, 130 S. Ct. 2592 (2010); the Takings claims are constitutionally cognizable; the *Ex parte Young*[29] exception to Eleventh Amendment immunity applies to their Due Process claims; the Takings claims are ripe for review; and the complaint adequately alleges each claim. ECF No. 34.[30]

---

[28] The State Defendants further argue that, to the extent the Plaintiffs claim there are ongoing state eviction proceedings against them, the Court should exercise *Younger* abstention. ECF No. 26 at 30-32. The Plaintiffs respond that no state judicial proceeding has been "instituted." ECF No. 34 at 20. Thus, the Court need not consider whether abstention is warranted.

[29] 209 U.S. 123 (1908).

[30] The Plaintiffs also allege that their Takings claims are "entirely outside" the Eleventh Amendment's scope. ECF No. 34 at 15-17. Because the State Defendants have not raised the Eleventh Amendment as a defense to the Takings claims, *see* ECF No. 25 (asserting Eleventh Amendment immunity as a defense to Counts I-IV, VII, and VIII); ECF No. 26 at 13-18 (same), the Court will not address the Plaintiffs' argument.

"Article III generally requires a federal court to satisfy itself of its jurisdiction over the subject matter before it considers the merits of a case." *Ruhrgas AG v. Marathon Oil Co.,* 526 U.S. 574, 583 (1999). As with subject matter jurisdiction generally, *Khoury,* 268 F. Supp. 2d at 606, the burden of proof "lies squarely on" the Plaintiffs to show that they have standing to invoke federal jurisdiction, and their claims are ripe for review.[31]

1. Standing and Ripeness

a. Standing

There are two parts of standing: Article III standing, which ensures that a suit presents a "case" or "controversy" as required by the Constitution, and "prudential standing," which encompasses "judicially self-imposed limits on the exercise of federal jurisdiction." *Allen v. Wright,* 468 U.S. 737, 751 (1984).[32] To satisfy the "irreducible constitutional minimum of

---

[31] *Doe v. Va. Dep't of State Police,* No. 11-1841, 2013 WL 1496937, at *9 (4th Cir. Apr. 12, 2013) (Keenan, J., concurring) (*citing David v. Alphin,* 704 F.3d 327, 333 (4th Cir. 2013); *Miller v. Brown,* 462 F.3d 312, 319 (4th Cir. 2006)); *see Dan River, Inc. v. Unitex Ltd.,* 624 F.2d 1216, 1223 (4th Cir. 1980) ("[W]hether raised or not, jurisdictional standing is an issue to be considered *sua sponte* by the court . . . ."); *see also Constantine v. Rectors & Visitors of George Mason Univ.,* 411 F.3d 474, 480 (4th Cir. 2005) ("[A] federal court necessarily acts *ultra vires* when it considers the merits of a case over which it lacks subject-matter jurisdiction.").

[32] The Defendants have not challenged the Plaintiffs' prudential standing; accordingly, such a challenge has been waived. *See,*

standing," Weigel, Profili, and Gangi must demonstrate that they suffered an actual or threatened concrete injury that is fairly traceable to the challenged conduct and likely to be redressed by a favorable decision. *McBurney v. Cuccinelli*, 616 F.3d 393, 402 (4th Cir. 2010); *see Warth v. Seldin*, 422 U.S. 490, 502–03 (1975) (evaluating class action standing by reference to the representative plaintiffs).

   i.   Injury in Fact

To satisfy Article III's "injury-in-fact" requirement, the Plaintiffs must show an "invasion of a legally protected interest," that is (1) concrete and particularized, and (2) "actual or imminent." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks omitted). When a plaintiff seeks prospective relief, he must show a continuing injury; standing for retrospective relief can be based on past injuries alone.[33] A plaintiff "may have standing even if [he] ha[s] never been prosecuted or actively threatened with prosecution," *Dias*, 567 F.3d at 1178 n.8, so long as the challenged regulation poses a "sufficiently direct threat of

---

*e.g.*, *Bd. of Natural Res. of State of Wash. v. Brown*, 992 F.2d 937, 945-46 (9th Cir. 1993).

[33] *See O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects."); *see also People for the Ethical Treatment of Animals v. Rasmussen*, 298 F3d 1198, 1202 (10th Cir. 2002).

personal detriment" to him, *Doe v. Bolton*, 410 U.S. 179, 188 (1973).[34]  Consistent with this requirement, "[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness." *Parker v. Levy*, 417 U.S. 733, 756 (1974).[35]

Here, the Plaintiffs are all members of Armistead and licensed owners of dogs whom they "believe[] to be" pit bulls or pit bull mixes. ECF No. 20 ¶¶ 20-22, 36, 49.  Licensed dogs are "personal property" under Maryland law.  Md. Code Ann., Art. 24 § 11-506.  And, "[t]here is no doubt that a membership in [Armistead], together with the related leasehold interest in a dwelling unit, constitutes a property interest." 85 Md. Op. Att'y Gen. 265, 267 (2000).  Before the *Tracey* decision, Armistead's "Handbook for Member-Residents" permitted members to own "no more than two animals." ECF No. 20 ¶ 41.  Because of the decision in *Tracey*, Armistead's board of directors passed a motion that no pit bull or cross-bred pit bull be permitted on Armistead's premises.  ECF No. 16-1 ¶ 4.  The Board may take legal action, including termination, against leaseholders who

---

[34] *See Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 160 (4th Cir. 2000) ("[O]ne does not have to await the consummation of threatened injury to obtain preventative relief.  If the injury is certainly impending, that is enough." (internal quotation marks omitted)).

[35] *See also Mom N Pops, Inc. v. City of Charlotte, N.C.*, 162 F.3d 1155 (Table), 1998 WL 537928, at *6 (4th Cir. 1998) ("Because the ordinance clearly applies to [the plaintiff], it does not have standing to bring this claim . . . we decline to address vagueness in the abstract.").

fail to comply with the ban. ECF No. 16-4 at 2. By August 10, 2012 letter, Armistead President Sharon Vick notified members of the new rule. *Id.* Armistead avers it will "follow its procedures and give at least 20 days' notice to any leaseholder before initiating action against any leaseholder for any issue relevant to this case." ECF No. 29 at 2. Thus, at any moment and with fewer than three weeks' notice, Armistead--in reliance on *Tracey*--may require the Plaintiffs to relinquish their dogs or their membership in the corporation.

Accepting all properly pled factual allegations in the complaint as true, and construing all facts in the light most favorable to the Plaintiffs, the Court finds that the Plaintiffs have articulated sufficiently particularized and concrete harm to sustain a finding of injury in fact. *Cf. Doe v. Va. Dep't of State Police*, 2013 WL 1496937, at \*3; *Dias v. City & Cnty. of Denver*, No. 07-cv-00722-WDM-MJW, 2010 WL 3873004, at \*8 (D. Colo. Sept. 29, 2010) (owners of pit bulls have a "personal stake and interest" in challenging regulations specific to the breed).[36]

---

[36] The Plaintiffs have alleged, in Counts I, II, and VII, that *Tracey* is facially void for vagueness. ECF No. 20 at 15-19, 25-27. Under *Parker*, "[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness." 417 U.S. at 756. Here, the Plaintiffs allege that their dogs are "believed" to be pit bulls or pit bull mixes. ECF No. 20 ¶¶ 20-22. That the Plaintiffs believe their dogs are pit bulls does not render their alleged injury constitutionally infirm; as the

ii.    Causation

Traceability is established if it is "likely that the injury was caused by the conduct complained of and not by the independent action of some third party not before the court." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 154 (4th Cir. 2000) (*citing Lujan*, 504 U.S. at 561). Here, the causation requirement is met because the Plaintiffs have sued all relevant State Defendants conceivably involved in "passing" and "enforcing" *Tracey*, as well as the private party (Armistead) who has allegedly "implemented" the decision, to the Plaintiffs' detriment.

iii.    Redressability

An injury is redressable if it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). But, "no explicit guarantee of redress to a plaintiff is required to demonstrate a plaintiff's standing." *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 100 (4th Cir. 2011). Here, the Plaintiffs request various forms of declaratory and injunctive relief, including a judgment that *Tracey* is "unconstitutional, void, and unenforceable," and a preliminary and permanent

---

Plaintiffs note, neither *Tracey* nor Armistead defined the term. *See Tracey*, 50 A.3d at 1097; ECF No. 16-4 at 2.

24

injunction restraining Armistead from evicting tenants "based on" the decision. ECF No. 20 at 31. There is some--contested-- authority that a federal district court may declare unconstitutional a state court decision that effects a Fifth Amendment taking. *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Protection*, 130 S. Ct. 2592, 2601 (2010) (plurality opinion). A decision that *Tracey* is unconstitutional would likely redress the Plaintiffs' injury (loss of their pitbulls or membership), as Armistead expressly relied on the decision in choosing to ban the animals. ECF No. 16-4 at 2.

Thus, the Court finds, at this stage in the proceedings, that the Plaintiffs have adequately shown standing to assert their claims.

b. Ripeness

"Although the phrasing makes the questions of who may sue and when they sue seem distinct, in practice there is an obvious overlap between the doctrines of standing and ripeness." Erwin Chemerinsky, *Federal Jurisdiction* § 2.4 (4th ed. 2003). A claim should be dismissed as unripe if the plaintiff has not yet suffered injury and any future impact "remains wholly specu- lative." *Gasner v. Bd. of Supervisors*, 103 F.3d 351, 361 (4th Cir. 1996).[37] In determining ripeness, courts "balance the

---

[37] *See also Rescue Army v. Mun. Ct. of L.A.*, 331 U.S. 549, 584 (1947) (ripeness doctrine prevents a court from considering a

25

fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration." *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006). A case is fit for judicial decision when "the issues are purely legal" and "the action in controversy is final and not dependent on future uncertainties." *Id.* The "hardship" consideration in a ripeness analysis is "measured by the immediacy of the threat and the burden imposed on the petitioner who would be compelled to act under threat of enforcement of the challenged law." *Charter Fed. Sav. Bank v. Office of Thrift Supervision*, 976 F.2d 203, 208-09 (4th Cir. 1992).

Regulatory takings claims are generally subject to additional ripeness requirements. Specifically, the plaintiff must demonstrate that: (1) the government entity charged with implementing the regulations in question has issued a "final decision regarding the application of the regulations to the property at issue," and (2) the plaintiff has sought and been denied just compensation through available and adequate state procedures. *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186, 195 (1985). Three caveats to this general rule are relevant here. First, *Williamson* does not apply when a plaintiff challenges the facial

controversy until it is presented in "clean-cut and concrete form").

validity of a regulation.[38]  Second, plaintiffs need not exhaust

state administrative remedies when the claim arises under 42

U.S.C. § 1983.  *Williamson*, 473 U.S. at 192-93.  Finally,

several courts have recognized a "futility" exception to

*Williamson*'s exhaustion requirement.  *E.g.*, *Wash. Legal Found.*

*v. Legal Found. of Wash.*, 271 F.3d 835, 851 (9th Cir. 2001) (en

banc) (finding futility exception when state supreme court was

defendant in federal suit and denied possibility of state relief

in its brief).[39]

*Tracey*'s future effect on the Plaintiffs is more than

speculative: Armistead has adopted a rule, instigated by

*Tracey*'s new strict liability standard, that no pit bull be

permitted on Armistead's premises.  ECF No. 16-1 ¶ 4.

---

[38] *See Hacienda Valley Mobile Estates v. City of Morgan Hill*, 353
F.3d 651, 655 (9th Cir. 2003) ("Facial challenges are exempt
from the first prong of the *Williamson* ripeness analysis because
a facial challenge by its nature does not involve a decision
applying the statute or regulation."); *see also Holliday
Amusement Co. of Charleston, Inc. v. South Carolina*, 493 F.3d
404, 407 (4th Cir. 2007) ("We recognize . . . that the state
procedures requirement does not apply to facial challenges to
the validity of a state regulation.").

[39] *See also Stop the Beach*, 130 S. Ct. at 2609 (plurality
opinion) ("[*Williamson*'s finality principles] would require the
[judicial takings] claimant to appeal a claimed taking by a
lower court to the state supreme court, whence certiorari would
come to this Court.  If certiorari were denied, the claimant
would no more be able to launch a lower-court federal suit
against the taking effected by the state supreme-court opinion
than he would be able to launch such a suit against a
legislative or executive taking approved by the state supreme-
court opinion; the matter would be res judicata.").

Armistead's Board may, at any time, choose to terminate a leaseholder who fails to comply with the allegedly unconstitutional ban. ECF No. 16-4 at 2. The case is fit for judicial decision because the issues presented are purely legal: whether *Tracey*, on its face and as applied, violates the Fourteenth Amendment's Due Process Clause, the Fifth Amendment's Takings Clause, as incorporated against the states, and parallel Maryland law. *See generally* ECF No. 20. Finally, compliance with Armistead's policy imposes the heavy burden of requiring a pit bull owner to either vacate his or her home or abandon a family pet. ECF No. 16-4 at 2. Nor does *Williamson* preclude relief on the Plaintiffs' Takings claims: the Plaintiffs have raised facial challenges, and one of the three Takings counts (Count VI) arises under § 1983. ECF No. 20 ¶¶ 116, 129, 160.[40]

The Supreme Court has held that *Williamson*'s ripeness prongs are "prudential hurdles," *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 734 (1997), not jurisdictional requirements, *Stop the Beach*, 130 S. Ct. at 2610 (majority opinion). The above-stated reasons persuade this Court that adjudication on the merits is appropriate. The Court will therefore consider the Defendants' nonjurisdictional bases for relief: immunity, and failure to state a claim.

---

[40] *Hacienda Valley Mobile Estates*, 353 F.3d at 655; *see Holliday Amusement*, 493 F.3d at 407; *see also Williamson*, 473 U.S. at 192–93.

2. Immunity

The State Defendants argue that the Plaintiffs' Due Process claims against them (Counts I-IV, VII, VIII) are barred by Eleventh Amendment immunity, and Chief Judge Bell has absolute judicial immunity from the Plaintiffs' claims for injunctive relief. ECF No. 25.

a. Eleventh Amendment

The Eleventh Amendment provides that, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI.[41] "[T]he essence of the immunity is that the State cannot be sued in federal court at all, even where the claim has merit, and the importance of immunity as an attribute of the States' sovereignty is such that a court should address that issue promptly once the State asserts its immunity." *Constantine*, 411 F.3d at 482 n.4.

The Amendment has been construed to "bar[] suit in federal court against an unconsenting state *and any governmental units*

---

[41] Although the Eleventh Amendment expressly applies only to suits brought against a state by "Citizens of another State," the U.S. Supreme Court has held that "an unconsenting State is immune from suits brought in federal courts by her own citizens as well." *Gray v. Laws*, 51 F.3d 426, 430 (4th Cir. 1995) (internal quotation marks omitted).

*that are arms of the state* unless Congress has abrogated the

immunity." *Coleman v. Md. Ct. App.*, 626 F.3d 187, 191 (4th Cir.

2010) (emphasis added) (*citing Alden v. Maine*, 527 U.S. 706,

755-57 (1999)). To determine whether a party is an "arm of the

state," courts consider four, "nonexclusive" factors:

> (1) whether any judgment against the entity as
> defendant will be paid by the State or whether any
> recovery by the entity as plaintiff will inure to the
> benefit of the State;
> (2) the degree of autonomy exercised by the entity,
> including such circumstances as who appoints the
> entity's directors or officers, who funds the entity,
> and whether the State retains a veto over the entity's
> actions;
> (3) whether the entity is involved with state concerns
> as distinct from non-state concerns, including local
> concerns; and
> (4) how the entity is treated under state law, such as
> whether the entity's relationship with the State is
> sufficiently close to make the entity an arm of the
> State.[42]

In addition to suing the State of Maryland, the Plaintiffs

have sued the Maryland Court of Appeals and several state

officials. ECF No. 20. There can be no doubt that, having been

"vested" with the "Judicial power" of the State of Maryland, the

Court of Appeals is an "arm" of that state. *See* Md. Const. Art

4, §§ 1, 14, 18; Md. Code Ann., Cts. & Jud. Proc. § 1-301;

*Fishback v. Maryland*, No. JFM-12-927, 2012 WL 1145034, at *2 (D.

Md. Apr. 4, 2012) (dismissing, on Eleventh Amendment grounds,

the plaintiff's complaint against the Circuit Court for

---

[42] *United States ex rel. Oberg v. Ky. Higher Educ. Student Loan
Corp.*, 681 F.3d 575, 580 (4th Cir. 2012).

Baltimore City and the Maryland Court of Special Appeals).[43] So, too, are Governor O'Malley, Attorney General Gansler, and Chief Judge Bell, who have been sued in their official capacities. ECF No. 20 ¶¶ 24, 25, 27, 84, 112, 151, 165; *see Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Accordingly, Counts I-IV, VII, and VIII are barred unless an exception to immunity applies.

There are several exceptions to the Eleventh Amendment bar. *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 107 n.13 (4th Cir. 2011). Relevant here, the U.S. Supreme Court has held that the Amendment does *not* prevent private individuals from bringing suit against State officials for prospective or declaratory relief for ongoing violations of federal law.[44] The *Ex parte Young* exception is directed at "officers of the state

---

[43] *See also Lucas v. Ariz. Sup. Ct. Fiduciary Certification Program*, 457 F. App'x 689, 690 (9th Cir. 2011) (Arizona Supreme Court is "arm of the state"); *Pucci v. Nineteenth Dist. Ct.*, 628 F.3d 752, 763 (6th Cir. 2010) (Michigan Supreme Court is "arm of the state"); *Lucas v. Lightfoot*, 987 F.2d 771, 1993 WL 67188, at *3 (5th Cir. 1993) (per curiam) (Louisiana Supreme Court is "arm of the state"); *Zuckerman v. App. Div., Second Dep't, Sup. Ct. of*, 421 F.2d 625, 626 (2d Cir. 1970) (New York state courts are "arms of the state").

[44] *See Ex parte Young*, 209 U.S. 123 (1908); *Litman v. George Mason Univ.*, 186 F.3d 544, 549-50 (4th Cir. 1999); *see also Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (a court examining the *Ex parte Young* doctrine must conduct "a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective" (alteration in original) (internal quotation marks omitted)).

[who] are clothed with some duty in regard to the enforcement of the laws of the state, *and* who threaten and are about to commence proceedings . . . to enforce against parties affected [by] an unconstitutional act." *Id.* at 155–56 (emphasis added). Thus, for the exception to apply, there must be a "special relation" between the officer being sued and the challenged statute. *Id.* at 157. This requirement of *"proximity to* and *responsibility for* the challenged state action" is not met when an official merely possesses "[g]eneral authority to enforce the laws of the state."[45]

The Plaintiffs contend that, "[a]s chief executive of the State of Maryland," O'Malley "has a duty to take care that the laws are faithfully executed pursuant to federal and State of Maryland law." ECF No. 20 ¶ 24. The Plaintiffs further allege that Gansler "is charged by law with enforcement of the State of Maryland's laws and the defense of the constitutionality of the laws of the State of Maryland." *Id.* ¶ 25. Finally, the Plaintiffs assert that Chief Judge Bell is "the constitutional administrative head of the Maryland judicial system and is charged with upholding the Constitution of the United States and the Constitution of the State of Maryland, acting on the authority granted to him by the State of Maryland." *Id.* ¶ 27.

---

[45] *S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 332-33 (4th Cir. 2008) (alteration and emphasis in original) (internal quotation marks omitted).

The Plaintiffs conclude that, because the State officials have "a duty to enforce state policy and procedures . . . under color of state law," they also have a "special relation" to *Tracey*, warranting application of the *Ex parte Young* exception. ECF No. 34 at 14-15. The State Defendants object that "none of these officials is responsible for the actual implementation and enforcement of the laws that pertain to the relief sought by plaintiffs." ECF No. 26 at 14.

"General authority to enforce the laws of the state is not sufficient to make government officials the proper parties to litigation challenging the law." *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 331 (4th Cir. 2001) (internal quotation marks omitted). Here, although O'Malley and Gansler are generally under a duty to enforce and protect Maryland law, neither is charged with the duty to "enforce" *Tracey*. *See id.* Similarly, Chief Judge Bell can neither commence nor threaten to commence proceedings under the decision. *Cf. Shalaby v. Freedman*, No. C 03-03358 CRB, 2003 WL 22416492, at *4 (N.D. Cal. Oct. 21, 2003) ("It is thus unsurprising that [the plaintiff] has not cited a single case, and the Court has not located any, in which a plaintiff challenging a civil statute enforced by private litigants was able to avoid the Eleventh Amendment bar by suing the judges of a state."), *aff'd*, 138 F. App'x 897 (9th Cir. 2005).

Thus, Counts I through IV, VII, and VIII are barred by Eleventh Amendment immunity.

b. Absolute Judicial Immunity

"It is well-established that judges enjoy judicial immunity from suits arising out of the performance of their judicial functions." *Brookings v. Clunk*, 389 F.3d 614, 617 (6th Cir. 2004) (*citing Pierson v. Ray*, 386 U.S. 547, 553-54 (1967) and *Mann v. Conlin*, 22 F.3d 100, 103 (6th Cir. 1994)).[46] By contrast, a judge is not entitled to judicial immunity for performing "nonjudicial actions" or acting, although in a judicial capacity, "in the complete absence of all jurisdiction." *Mireles v. Waco*, 502 U.S. 9, 11-12 (1991). "[W]hether an act by a judge is a 'judicial' one relate[s] to the nature of the act itself, *i.e.*, whether it is a function normally performed by a judge, and to the expectations of the parties, *i.e.*, whether they dealt with the judge in his judicial capacity." *Stump v. Sparkman*, 435 U.S. 349, 362 (1978).

Here, Chief Judge Bell acted in a quintessentially judicial capacity when he participated in the *Tracey* decision. Further, he did not exceed his judicial authority; Chief Judge Bell and his colleagues are specifically tasked with developing

---

[46] *See also* 42 U.S.C. § 1983 ("[I]n any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.").

34

Maryland's common law. *See Ireland v. State*, 529 A.2d 365, 366 (Md. 1987) ("Because of the inherent dynamism of the common law, we have consistently held that it is subject to judicial modification in the light of modern circumstances or increased knowledge.").

The claims against Judge Bell are barred by absolute judicial immunity.

3. Failure to State a Claim

To survive a motion to dismiss, a complaint must allege facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Here, the Plaintiffs sued "to prevent the Defendants from enforcement of [*Tracey*] . . . and from unilaterally taking their constitutionally protected property interests in their leasehold agreements and membership in Armistead . . . and/or their constitutionally protected interests in their dogs." ECF No. 22-1 at 1. The amended complaint appears to assert three substantive bases for relief: (1) Fourteenth Amendment procedural due process (Counts I, II); (2) Fourteenth Amendment substantive due process (Counts III, IV); and (3) Fifth Amendment judicial taking[47] (Counts V, VI).

---

[47] As incorporated through the Fourteenth Amendment. *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 160 (1980).

35

ECF No. 20 ¶¶ 61-141.[48]

a. Unconstitutional Vagueness (Counts I, II)[49]

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012). The "void-for-vagueness" doctrine, which stems from the right to procedural due process,[50] "addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Id.*

---

[48] Counts VII through IX allege state law claims on the same substantive grounds. *See* ECF No. 20 ¶¶ 142-84.

[49] Counts I and II allege unconstitutional vagueness; the only distinction between the counts is that Count II arises under 42 U.S.C. § 1983. ECF No. 20 at 15-19. Counts III and IV, and V and VI, are similarly paired. *Id.* at 19-23. Section 1983 provides a remedy against any person who, acting under color of law, deprives another of constitutional rights. 42 U.S.C. § 1983. It "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (internal quotation marks and citation omitted). Thus, to prevail on the merits of their constitutional and § 1983 claims, the Plaintiffs must first plausibly allege a constitutional violation. The Court will therefore consider the substantively identical federal claims (Counts I and II, III and IV, and V and VI) together.

[50] *See, e.g.*, *United States v. PATCO Local 202*, 678 F.2d 1, 3 (1st Cir. 1982) (*citing Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)).

However,

> Striking down ordinances (or exceptions to the same)
> as facially void for vagueness is a disfavored
> judicial exercise. Nullification of a law in the
> abstract involves a far more aggressive use of
> judicial power than striking down a discrete and
> particularized application of it. Of course there
> will be hard cases under any law. It is preferable
> for courts to demonstrate restraint by entertaining
> challenges to applications of a law as those
> challenges arise.

*Schleifer by Schleifer v. City of Charlottesville*, 159 F.3d
843, 853 (4th Cir. 1998).[51] Accordingly, a party challeng-
ing the facial validity of a law on vagueness grounds bears
the heavy burden of demonstrating that the law is
impermissibly vague in *all* its applications.[52]

Under *Tracey*, "upon a plaintiff's sufficient proof" that a
dog involved in an attack is a "pit bull," and that the owner or
landlord knows or should know that the dog is a "pit bull," the
owner or landlord is strictly liable for the damages caused to a
plaintiff who is attacked by the dog. *Tracey*, 50 A.3d at 1089.
The Plaintiffs emphasize that *Tracey* does not identify which
physical or behavioral traits characterize a "pit bull," or
explain what information would constitute "knowledge" that a dog

---

[51] *See also United States v. Sun*, 278 F.3d 302, 309 (4th Cir.
2002) (facial vagueness challenges to criminal statutes are
allowed only when the statute implicates First Amendment
rights).

[52] *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
455 U.S. 489, 497 (1982).

is a pit bull. ECF No. 20 ¶¶ 65-68, 77-79. They argue that *Tracey*'s failure to articulate such a standard "deprives the Plaintiffs and those similarly situated of procedural due process." *Id.* ¶¶ 69, 81.

The Plaintiffs have not identified--and the Court has not found--any controlling authority that applies the void-for-vagueness doctrine to judicial decisions. *See generally* ECF Nos. 20, 22; *cf. Swagler v. Neighoff*, 398 F. App'x 872, 879 (4th Cir. 2010) ("[T]he void-for-vagueness doctrine focuses on *legislation*--not 'policies and actions.'" (emphasis added)). Even assuming the doctrine's relevance, the U.S. Supreme Court has held that it applies to civil actions only when "the exaction" of obedience to a rule or standard is "so vague or indefinite as really to be no rule or standard." *Boutilier v. INS*, 387 U.S. 118, 123 (1967) (internal quotation marks omitted). *Tracey* does not "exact" obedience to any rule. It merely cautions that, if a person *chooses* to own or keep a pit bull, he will be strictly liable should the dog injure another person. *See Tracey*, 50 A.3d at 1089. Contrary to the Plaintiffs' suggestion, the distinction is not mere semantics.[53] More importantly, there is minimal authority that *Tracey*'s failure to define "pit bull" renders the decision "so vague or

---

[53] *See, e.g.*, ECF No. 22-1 at 2 (stating that *Tracey* "forces" Armistead to terminate the Plaintiffs' property interests).

indefinite as really to be no rule or standard at all."

*Boutilier*, 387 U.S. at 123. Indeed, courts have widely rejected
vagueness challenges to pit bull-specific legislation.[54]

Thus, the amended complaint does not plead a plausible
void-for-vagueness claim.

---

[54] *See, e.g., Dias v. City & Cnty. of Denver*, No. 07-cv-00722-
WDM-MJW, 2010 WL 3873004, at *1, *2-3 (D. Colo. Sept. 29, 2010)
(ordinance defined "pit bull" as "any dog that is an American
Pit Bull Terrier, American Staffordshire Terrier, Staffordshire
Bull Terrier, or any dog displaying the majority of physical
traits of any one . . . or more of the above breeds, or any dog
exhibiting those distinguishing characteristics which
substantially conform to the standards established by the
American Kennel Club ["AKC"] or United Kennel Club ["UKC"]");
*Coalition of Human Advocates for K9's & Owners v. City & Cnty.
of San. Fran.*, No. C-06-1887 MMC, 2007 WL 641197, at *4 n.4,
*11-12 (N.D. Cal. Feb. 27, 2007) (same); *Am. Dog Owners Ass'n v.
Dade Cnty., Fla.*, 728 F. Supp. 1533, 1535, 1540-41 (S.D. Fla.
1989) (ordinance defined "pit bull" by physical characteris-
tics); *Vanater v. Vill. of S. Point*, 717 F. Supp. 1236, 1239,
1244 (S.D. Ohio 1989) (ordinance defined "pit bull" as "any
Staffordshire Bull Terrier or American Staffordshire Terrier
breed of dog, or any mixed breed of dog which contains, as an
element of its breeding the breed of Staffordshire Bull Terrier
or American Staffordshire Terrier as to be identifiable as
partially of the breed of Staffordshire Bull Terrier or American
Staffordshire Terrier by a qualified veterinarian duly licensed
by the State of Ohio"); *see also, e.g., Colo. Dog Fanciers, Inc.
v. City & Cnty. of Denver*, 820 P.2d 644, 650-51 (Colo. 1991) (en
banc); *State v. Anderson*, 566 N.E.2d 1224, 1227-28 (Ohio 1991)
("pit bull dogs are distinctive enough that the ordinary dog
owner knows or can discover with reasonable effort whether he or
she owns such a dog"); *Greenwood v. City of N. Salt Lake*, 817
P.2d 816, 819-20 (Utah 1991). *But see Am. Dog Owners Ass'n v.
City of Lynn*, 533 N.E.2d 642, 644, 646 (Mass. 1989).

39

b. Substantive Due Process (Counts III, IV)

The Fourteenth Amendment's Due Process Clause "guarantees more than fair process."[55] It also covers a substantive sphere, "barring certain government actions regardless of the fairness of the procedures used to implement them." *Daniels v. Williams*, 474 U.S. 327, 331 (1986). "This substantive component guards against arbitrary legislation by requiring a relationship between a statute and the government interest it seeks to advance." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1181 (10th Cir. 2009). If a law burdens a fundamental right, the infringement must be narrowly tailored to serve a compelling government interest. *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997). If a law burdens a lesser right, the infringement need only be rationally related to legitimate government interests. *Id.* at 728.[56]

The Plaintiffs assert, without citation to any authority, that the right to own and keep dogs is fundamental. ECF No. 20 ¶¶ 88, 102. They argue that *Tracey*'s imposition of strict

---

[55] *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997).

[56] *See also Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 827 (4th Cir. 1995) (to "make out" a substantive due process claim, a plaintiff must demonstrate "(1) that [he] had property or a property interest; (2) that the state deprived [him] of this property or property interest; and (3) that the state's action falls so far beyond the outer limits of legitimate governmental action that *no process* could cure the deficiency." (emphasis in original)).

liability for pit bull attacks is not "narrowly tailored to serve a compelling government interest"--and in fact is arbitrary and irrational--because there is authority that pit bulls can be affectionate animals; the Plaintiffs' dogs are affectionate in fact; and *Tracey* "does nothing to protect against situations that could cause an unexpected attack." *Id.* ¶¶ 89, 94, 103, 108. Alternatively, the Plaintiffs assert that "there is no rational relation between the imposition of strict liability on owners of 'pit bulls.'" *Id.* ¶¶ 97, 111; *see id.* ¶¶ 90, 104 (stating that *Tracey*'s imposition of strict liability is "not a reasonable means of advancing any legitimate governmental interest").[57]

The right to own and keep dogs is not fundamental. *Nicchia v. New York*, 254 U.S. 228, 230 (1920) (property in dogs is "of an imperfect or qualified nature and [dogs] may be subjected to peculiar and drastic police regulations by the state without depriving their owners of any federal right").[58] Therefore, to

---

[57] The Plaintiffs also allege that "most of the people who would be subject to [*Tracey*] are judgment proof and . . . the threat of being held strictly liable for an unexpected dog attack would be of no value [to them]." ECF No. 20 ¶¶ 93, 107.

[58] *See also Sentell v. New Orleans & Carrollton R.R.*, 166 U.S. 698, 704 (1897) ("Even if it were assumed that dogs are property in the fullest sense of the word, they would still be subject to the police power of the State, and might be destroyed or otherwise dealt with, as in the judgment of the legislature is necessary for the protection of its citizens."); *Brzonkala v. Va. Polytechnic Inst. & State Univ.*, 169 F.3d 820, 903 (4th Cir.

the extent that any standard of review applies to substantive due process challenges to judicial decisions, it would be the rational basis standard. *Glucksberg*, 521 U.S. at 728. This standard is highly deferential. *See New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) ("[T]he judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines.").[59]

The Plaintiffs allege that *Tracey* "and its designations of a 'pit bull' as applied to owners and landlords being strictly liable for a dog attack" are "not a reasonable means of advancing any legitimate governmental interest." ECF No. 20 ¶¶ 90, 104; *see also id.* ¶¶ 92, 106. The Plaintiffs do not appear

---

1999) (stating that the general police power is "recognized to include the right of the States to promote the public health, safety, welfare, and morals of the State").

[59] Similarly, a federal court should not judge the wisdom or desirability of state court decisions on issues of state law. *Nicholson v. Scoppetta*, 344 F.3d 154, 168 (2d Cir. 2003) ("We defer to state primacy in areas of traditional state concern . . . not only out of comity but also because the state is often far more expert than we are at understanding the implications of each decision in its practiced field." (internal citations omitted)); *Harris v. Ford Motor Co.*, 110 F.3d 1410, 1417 (9th Cir. 1997) (Van Sickle, J., dissenting) (emphasizing that tort law is an area of "traditional state authority"); *see also Bush v. Gore*, 531 U.S. 98, 112 (2000) (Rehnquist, J., concurring) ("In most cases, comity and respect for federalism compel us to defer to the decisions of state courts on issues of state law. That practice reflects our understanding that the decisions of state courts are definitive pronouncements of the will of the States as sovereigns." (*citing Erie R.R. v. Tompkins*, 304 U.S. 64 (1938))).

to dispute that the protection of health and public safety is a legitimate state interest. Instead, they insist that *Tracey* did not create specific rules or regulations that would "foster" such protection. *Id.* ¶¶ 93, 107. Their argument is wrong.

Strict liability "maximizes deterrence and eases enforcement difficulties." *Dep't of Housing & Urban Dev. v. Rucker*, 535 U.S. 125, 134 (2002). Here, the imposition of strict liability on pit bull owners encourages those persons to take extra precautions in keeping and caring for their dogs. Such precautions were necessary, the *Tracey* court reasoned, in light of evidence establishing the breed's unusual dangerousness.[60] This Court cannot conclude that the decision was arbitrary or irrational.[61]

---

[60] *See Tracey*, 50 A.3d at 1083-89 (collecting data).

[61] Several courts have rejected substantive due process challenges to pit bull-specific legislation. *See, e.g.*, *Am. Canine Found. v. City of Aurora, Colo.*, 618 F. Supp. 2d 1271, 1277-79 (D. Colo. 2009) ("[A]mple evidence exists to establish a rational relationship between the City's ordinance regulating the possession of pit bulls and other restricted breeds and the City's undisputed legitimate interest in protecting the health and safety of [its] residents."), *aff'd sub nom. Vianzon v. City of Aurora*, 377 F. App'x 805 (10th Cir. 2010); *Am. Canine Found. v. Sun*, No. C-06-4713 MMC, 2007 WL 878573, at *5 (N.D. Cal. Mar. 21, 2007) ("The city's decision to require spaying and neutering of pit bulls as a means of reducing the number of pit bulls and, consequently, the number of pit bull attacks on children cannot be said to lack a rational basis."); *Vanater*, 717 F. Supp. at 1242-43 ("[T]he Ordinance is a reasonable response to the special threat presented by the [p]it [b]ull dog breed based upon their phenotypical characteristics and the traits which have been bred into the breed by their owners in order that the

Thus, the amended complaint does not plead a plausible substantive due process claim.

    c. Judicial Taking (Counts V, VI)

Under the Fifth Amendment, "private property [shall not] be taken for public use, without just compensation."  U.S. Const. amend. V.[62]  As the constitutional language implies, a sovereign may never take private property for private use, regardless of the compensation provided.  *Kelo v. City of New London, Conn.*, 545 U.S. 469, 477 (2005).

The Plaintiffs allege that *Tracey*, "on its face and as applied," effects a "judicial taking."  ECF No. 20 ¶¶ 116, 129. Although the precise grounds for their argument are unclear, the

---

animals may suit the purposes of their owners.").

    Counts III and IV further allege that *Tracey* "suddenly and unpredictably changed well-settled state law and violates the Due Process Clause of the [U.S.] Constitution for that reason as well."  ECF No. 20 ¶¶ 96, 110.  This argument apparently derives from a concurring opinion in *Stop the Beach Renourishment, Inc. v. Florida Department of Environmental Protection*, 130 S. Ct. 2592 (2010).  In that case, Justice Kennedy contended that the Court "would be on strong footing in ruling that a judicial decision that eliminates or substantially changes established property rights, which are a legitimate expectation of the owner, is 'arbitrary or irrational' under the Due Process Clause."  *Id.* at 2615 (Kennedy, J., concurring in part and concurring in the judgment).  Justice Kennedy concluded that the Due Process Clause would "*likely* prevent" a state from doing "by judicial decree what the Takings Clause forbids it to do by legislative fiat."  *Id.* (emphasis added) (internal quotation marks omitted).  Justice Kennedy's concurrence in *Stop the Beach* is insufficient to render the Plaintiffs' claim cognizable.

[62] The Fifth Amendment Takings Clause applies to the states through incorporation into the Fourteenth Amendment.  *Webb's*, 449 U.S. at 160.

Plaintiffs appear to allege that *Tracey* has appropriated the Plaintiffs' property interests in Armistead and their dogs and given those interests to Armistead and BARCS, respectively. *See* *id.* ¶¶ 118-20, 131-33; ECF No. 34 at 20 (claiming that the "effect" of *Tracey* "is that 'pit bulls' are being taken from [Armistead's] [r]esidents").[63] Because "[t]he public does not benefit from the taking," the Plaintiffs conclude that *Tracey* has taken their private property for private use. *See* ECF No. 20 ¶¶ 121, 134; ECF No. 34 at 13.[64]

There is some authority that a judicial decision can effect a Fifth Amendment taking. In *Stop the Beach Renourishment, Inc. v. Florida Department of Environmental Protection*, 130 S. Ct. 2592 (2010), a four-Justice plurality opined that "[i]t would be absurd to allow a State to do by judicial decree what the Takings Clause forbids it to do by legislative fiat." *Id.* at 2601. *Stop the Beach* provoked widespread controversy and

---

[63] The Plaintiffs assert that "[b]y taking the real property of the Plaintiffs and those similarly situated and giving it to Armistead Homes, the Defendants intend to benefit Armistead Homes, or in the case of dogs suspected to be 'pit bulls' given to BARCS or another party, [*Tracey*] merely benefits them and not the Plaintiffs or those similarly situated." ECF No. 20 ¶¶ 119, 132.

[64] Alternatively, the Plaintiffs assert that the Defendants have not provided just compensation for the taking. ECF No. 20 ¶¶ 124, 137.

criticism.[65] The Court need not determine whether a judicial takings claim is constitutionally cognizable here, because the Plaintiffs have failed to show a clear likelihood of success on their claim that a "taking" has occurred in the first place.

There are two categories of unconstitutional "takings" under federal law. The "paradigmatic" taking, requiring just compensation, occurs when the government directly appropriates or physically invades private property. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005). However, mere government regulation of private property may, in some instances, be sufficiently "onerous" to also support a Fifth Amendment takings claim. *Id.* The analysis in such a takings case "necessarily begins" with determining whether the government's action "actually interfered" with a property interest. *See Sunrise Corp. of Myrtle Beach v. City of Myrtle Beach*, 420 F.3d 322, 330

---

[65] Frederic Bloom & Christopher Serkin, *Suing Courts*, 79 U. Chi. L. Rev. 553, 555 (2012) ("Reactions to *Stop the Beach* have been swift and largely critical. Some have argued that it is nonsensical, even perverse, to hold courts liable for interpreting state law."). *See also generally* Stacey L. Dogan & Ernest A. Young, *Judicial Takings and Collateral Attack on State Court Property Decisions*, 6 Duke J. Const. L. & Pub. Pol'y 107, 112-13 (2011) (noting that a judicial takings doctrine could "chill the process of common-law decisionmaking"); Timothy M. Mulvaney, *The New Judicial Takings Construct*, 120 Yale L.J. Online 247, 265-66 (2011) (arguing that *Stop the Beach* "diverges significantly" from an historically "evolutionary view of the law"); E. Brantley Webb, Note, *How to Review State Court Determinations of State Law Antecedent to Federal Rights*, 120 Yale L.J. 1192, 1998 (2011) (stating that *Stop the Beach* "defies a century of deference and poses a serious threat to the development of state property law").

(4th Cir. 2005).

The Plaintiffs appear to allege that Armistead has acted in concert with the Maryland Court of Appeals to "take" their property. *See* ECF No. 22-1 at 10 ("There should be no dispute that Armistead . . . is taking the Residents' property pursuant to [*Tracey*].").[66] This argument is wrong. As discussed above, *Tracey* expressly denied that its new rule of liability required any person to relinquish his property. 50 A.3d at 1097.[67] Armistead's response to the decision by banning pit bulls is not a governmental taking; Armistead acted independently, and--as the Plaintiffs apparently concede--in full compliance with the corporation's operative leasehold documents. *See* ECF No. 16-3 at 2 (¶ 5(c)); ECF No. 22-1 at 5. *Tracey* may have *instigated* Armistead's action, but it did not *impel* it.[68]

---

[66] *See also* ECF No. 22-1 at 2 (stating that *Tracey* "forces" Armistead to terminate the Plaintiffs' property interests); *id.* at 3 (objecting to the decision in *Tracey* and Armistead's "corresponding taking of [the Plaintiffs'] Real Property in reliance on the provisions of [*Tracey*]").

[67] To the extent that the Plaintiffs argue that *Tracey*'s imposition of strict liability is itself an unconstitutional taking, there is authority to the contrary. *Cf., e.g., Burton v. Am. Cyanamid Co.*, 775 F. Supp. 2d 1093, 1099 (E.D. Wis. 2011) ("[T]he imposition of general liability does not constitute a taking of private property." (*citing McCarthy v. City of Cleveland*, 626 F.3d 280, 286 (6th Cir. 2010))).

[68] *Cf. Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 536-37 (1992) (Blackmun, J., concurring in part, concurring in the judgment in part, and dissenting in part) ("The level of choice that a defendant retains in shaping [his] own behavior

Even the owner of real property "necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police powers." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1027 (1992). And, "in the case of personal property . . . [the owner] ought to be aware of the possibility that new regulation might even render his property economically worthless." *Id.* at 1027-28. Such is the "burden borne to secure the advantage of living and doing business in a civilized community." *Andrus v. Allard*, 444 U.S. 51, 67 (1979) (internal quotation marks omitted). This is all the more true in the case of a "heavily regulated and highly contentious activity." *Holliday Amusement*, 493 F.3d at 411. The point is of particular relevance here, because the right to own and keep dogs is not fundamental, and--as the Court of Appeals recognized--pit bulls are widely perceived as singularly dangerous. *See Nicchia*, 254 U.S. at 230; *Tracey*, 50 A.3d at 1080.[69]

---

distinguishes the indirect regulatory effect of the common law from positive enactments such as statutes and administrative regulations. Moreover, tort law has an entirely separate function--compensating victims--that sets it apart from direct forms of regulation." (internal citations omitted)).

[69] *See also Bess v. Bracken Cnty. Fiscal Court*, 210 S.W.3d 177, 182 (Ky. Ct. App. 2006) (dog regulations are within the scope of a state's general police power, which "authorizes regulation and destruction of property without compensation if it promotes the general welfare of the citizens." (internal quotation marks omitted)).

Accepting the Plaintiffs' well-pled allegations as true, *Brockington*, 637 F.3d at 505, there has been no actual, government interference with the Plaintiffs' property. *Sunrise Corp.*, 420 F.3d at 330. No government actor has physically taken possession of any part of the Plaintiffs' property, or denied all economically viable use thereof.[70] And, even if the *Tracey* decision caused or constituted government interference with the Plaintiffs' dogs, such interference is within Maryland's police power, exercises of which are presumptively valid. *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 529 (1959) ("The various exercises by the States of their police power stand . . . on an equal footing. All are entitled to the same presumption of validity when challenged under the Due Process Clause of the Fourteenth Amendment.").

The amended complaint does not plead a plausible Takings claim.[71]

---

[70] *Cf. Lucas*, 505 U.S. at 1016; *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982).

[71] The Court notes, although it need not address, that the Plaintiffs' § 1983 claims against the State officials (Counts II, IV, and VI) are infirm for the additional reason that they do not adequately allege these Defendants' personal involvement in the alleged constitutional deprivations. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (1977).

d. State Law Claims (Counts VII-IX)

i. Due Process (Counts VII, VIII)

The Plaintiffs' state due process claims arise under Article 24 of the Maryland Declaration of Rights, which provides that "no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land." Md. Const. Decl. of Rights, art. 24. "It has been clearly established that Article 24 protects the same rights as the Fourteenth Amendment . . . ." *Barnes v. Montgomery Cnty., Md.*, 798 F. Supp. 2d 688, 700 (D. Md. 2011). "Therefore, the analysis under Article 24 is, for all intents and purposes, duplicative of the analysis under the Fourteenth Amendment." *Rosa v. Bd. of Educ. of Charles Cnty., Md.*, No. 8:11-cv-02873-AW, 2012 WL 3715331, at *6 (D. Md. Aug. 27, 2012) (*citing Okwa v. Harper*, 757 A.2d 118, 140-41 (Md. 2000); *Murphy v. Edmonds*, 601 A.2d 102, 108 (Md. 1992)).

As discussed above, the Plaintiffs have failed to state plausible federal due process claims. *See supra* Part II.B.3(a)-(b). The Plaintiffs have failed to state Maryland due process claims for the same reasons.

### ii. Judicial Taking (Count IX)

The Plaintiffs' state judicial taking claim arises under Article III, § 40 of the Maryland Constitution, which provides that, "[t]he General Assembly shall enact no Law authorizing private property, to be taken for public use, without just compensation, as agreed upon between the parties, or awarded by a Jury, being first paid or tendered to the party entitled to such compensation." Md. Const. art. III, § 40 (emphasis added). "[T]he Fifth and Fourteenth Amendments to the [U.S.] Constitution and Article III, § 40, of the Maryland Constitution have the same meaning and effect, and it is well established that the decisions of the Supreme Court are practically direct authorities for both provisions." *Neifert v. Dep't of Env't*, 910 A.2d 1100, 1118 n.33 (Md. 2006) (internal quotation marks and citations omitted).

As discussed above, the Plaintiffs have not plausibly alleged a federal taking. *See supra* Part II.B.3(c). Unlike the Fifth Amendment to the U.S. Constitution, Maryland's eminent domain provision is expressly limited to acts by the General Assembly. Md. Const. art. III, § 40; *see Stop the Beach*, 130 S. Ct. at 2601 (plurality opinion) (emphasizing that the Fifth Amendment's Takings Clause "is not addressed to the action of a specific branch or branches"). Thus, even if the Plaintiffs had pled a judicial taking under Maryland law, the plain text of

Maryland Constitution Article III, § 40 would preclude this Court's recognition of that cause of action.

III. Conclusion

For the reasons stated above, the State Defendants' motion to dismiss will be granted; all other pending motions will be denied as moot.

_____
Date   6/19/13

_____
William D. Quarles, Jr.
United States District Judge